IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| | ) | **DEFENDANT'S RESPONSE TO** |
| vs. | ) | **GOVERNMENT'S MOTION** |
| | ) | **IN LIMINE** |
| | ) | |
| ELLEN MADANS FROST, | ) | Docket No. 1:19CR64 |
| Defendant. | ) | |

NOW COMES the defendant, by and through the undersigned counsel, and responds to the Government's Motion in Limine filed on February 20, 2020. In that Motion, the Government seeks to prevent the jury from hearing any evidence about the benefits Buncombe County would and did receive under the advertising and sponsorship contracts which form the basis of the charges against Ellen Frost.

INTRODUCTION

(1) In 2013, planning began to open a large facility for equestrian sports, 30 minutes south of Asheville in Polk County. It would be called the Tryon International Equestrian Center ("TIEC"). TIEC was to host events that would be magnets for riders and equestrian fans from all over the world. Naturally, local governments and businesses began exploring the economic opportunities that the facility might present for the area. Ellen Frost, a Buncombe County Commissioner at the time and a horse owner, was among the people who took an interest in TIEC. She and others were involved in numerous discussions and meetings of a general nature beginning in late 2013.

(2) In late 2014 and early 2015, Ms. Frost, County Manager Wanda Greene, and others

were engaged in discussions regarding contracts for advertising and sponsorships at TIEC itself, a related facility in Wellington, Florida, and the national magazine for equestrian sports, Chronicle of the Horse (the "TIEC entities," collectively). The Asheville Regional Airport is a little over 30 minutes from Tryon. Given that proximity, coupled the County's hotels, dining and other attractions, the Airport was chosen as the target of the County's advertising sponsorship contracts with the TIEC entities in hopes of boosting the local economy.

(3) Distilled to its essence, the Government's argument in its Motion in Limine is that because the crimes charged in the Indictment require only proof that the contracts with the TIEC entities were funded by skipping what it alleges was a required step (voting at an open meeting), the jury should only hear about those steps. It claims that the case has nothing to do with suspicion that Ms. Frost personally benefited from the County's sponsorships. It even highlights an allegation in the Indictment that *the Asheville Airport was the beneficiary*.

(4) It is true that Ms. Frost did not personally benefit in any meaningful sense. It is also true that the Asheville Airport and Buncombe County did benefit.

(5) Those facts are relevant and admissible for 3 reasons: (a) Notwithstanding the Government's sterile recitation in its Motion of the statutes, the Indictment is full of allegations that Ms. Frost *did* have personal gain. She must be allowed to rebut those claims and innuendo, (b) Evidence of good reasons and a proper motive to enter into the advertising sponsorship contracts is relevant to undermine the 'specific intent' to do wrong required to convict, and (c) contrary to Government's Motion, proof of a legitimate purpose is a defense to Section 666(a)(1)(A) "intentional misapplication."

THERE WAS A LEGITIMATE PURPOSE FOR THE EQUESTRIAN SPONSORSHIPS

(6) In order to evaluate the relevance of the evidence the Government seeks to suppress,

it is necessary to consider what that evidence will be. At the outset, the defense would state that it does not plan to offer expert testimony on valuation of the advertising sponsorships, as is anticipated in the Government's Motion. Counsel for the defendant sought to dispel that notion when the parties conferred earlier this month, but clearly did not succeed. Defendant intends to offer more straightforward and less time-consuming evidence which will establish that there was good reason and a legitimate purpose to embark upon the advertising sponsorship contracts with the TIEC entities.

(7) Broadly speaking, the evidence relevant to this issue will take 4 forms: (1) evidence during the lead up to the contracts regarding the scale of the TIEC operation and the prospects for attracting people to the Airport and Buncombe County, (2) evidence that the cost of the County's advertising sponsorship contracts were reasonable, (3) evidence that there appeared to be collateral economic opportunities associated with the County's relationship with TIEC, and (4) evidence that the underlying motive for the contracts was sound, because many of the projected benefits to the County came to fruition as the contracts played out.

(8) A preview of some of the facts which Defendant will establish is as follows:

- TIEC was projected to and did become a massive sports and entertainment complex.

- In the 2015 eventing season (the first year of the Buncombe County contracts), TIEC was projected to host approximately 120,000 to 360,000 visitors and have a $53,360,000 economic impact on the region.

- It was projected that many people involved in equestrian sports would travel to North Carolina for the summer season from the Palm Beach area after the winter eventing season concluded in Wellington, Florida.

- Numerous Buncombe County bankers, hotel operators, and other businesses were aware of the new TIEC operation and were hoping to capitalize on the opportunity they believed it presented. Buncombe County and Asheville were widely regarded as an obvious destination for many of the participants and visitors to the events at TIEC.

- The advertising sponsorship contracts that Wanda Greene executed in 2015 carried

- substantially similar benefits as other sponsors received.

- The Airport regarded the advertising sponsorship contracts as valuable, and announced that it had experienced increased take-offs and landings as a result. The contracts were valuable enough to the Airport that it sought to renew them on its own in 2016 when the County's 2-year commitment expired.

- Greenville-Spartanburg Airport, located approximately the same distance from TIEC as the Asheville Airport, competed for and won those contracts in late 2016. GSP paid slightly more than Buncombe County had.

(9) It is anticipated that some of this evidence would be elicited from witnesses who will be testifying about other substantive matters. While some evidence would be admitted through witnesses who might not otherwise be testifying, counsel for the defendant expects that these proofs would not add more than an hour or two to the trial.

### THE GOVERNMENT'S CASE IS BUILT AROUND ALLEGATIONS OF 'PERSONAL BENEFIT' AND DEFEDANT'S REBUTTAL EVIDENCE SHOULD BE ADMITTED

(10) This case has been built around the erroneous optics of self-dealing while resting on the legal technicalities of the Federal misapplication statute. The trial arises in an environment where years of public officials showing pride and appreciation for their County Manager's ability to 'get things done' has flipped to a recognition that she was pulling the wool over everyone's eyes. The Government has crafted an Indictment against Ellen Frost that plays to that sense of betrayal. Legally and logically, she must be allowed to prove that there were good, legitimate reasons to sponsor the TIEC entities and rebut the appearance that she was self-dealing.

(11) In service of the request that the jury hear nothing about the what the contracts were worth, the Government argues in its Motion that their case does not invoke personal gain on Ms. Frost's part. She "is not charged with having embezzled, stolen, or obtained County funds for

herself." Govt. Motion @ p. 3. "The Government's theory of the case here is not that a public official enriched themselves…." Id. The funds were paid "for the benefit of a third party … the Asheville Regional Airport." Govt. Motion @ p.4.

(12) The Government seeks to downplay the extent to which it relied on claims of personal benefit to Ms. Frost in its Motion: "Other than one reference in the 'Manner and Means of the Conspiracy' portion of Count One to the Defendant's 'use and enjoyment of the VIP tables' … there is no allegation of any personal tangible benefit." Govt. Motion @ p. 3. It then contradicts that statement in a footnote, with a terse acknowledgement that the Indictment did allege 'some tangible benefits.' Govt. Motion @ p.4, n.1.

(13) The Defendant will put on evidence of the true nature of those events that Ms. Frost, other officials, County employees, and members of the public attended. We contend that the Government has exaggerated them in several ways. For purposes of this Response, however, it is necessary to set forth with clarity how thoroughly the Government has leaned on those alleged benefits and the innuendo - that those events were the underlying reason that Ms. Frost would somehow have her morals overborn such that she would intentionally violate the law.

(14) First, it is no small thing that the Government has alleged that 1 of the 5 enumerated "Manner and Means" of the conspiracy was motivated by Ms. Frost's desired "use and enjoyment" of the tables at TIEC. That is a plain assertion that she broke the law to obtain those personal benefits. The Indictment leans into that theme throughout, however.

(15) 11 paragraphs in the Indictment allege facts about the tables, 10 paragraphs allege facts about two dinners, and 9 paragraphs allege facts about two trips. Including the explicit allegation that her motive was her personal "enjoyment," 31 of the 125 paragraphs (1 in 4) address matters which the Government now claims have nothing to do with the case.

(16)  4 of the Section headings highlight the alleged personal benefits: "The County Funded Dinner (¶48), "The County Funded Trip …" (¶63), "The Legends Club VIP Table" (¶73), and "The County Funded Trip …" (¶85).  There are also 2 sections comprising an entire page in which the Government provides a description of State and local statutes prohibiting "Gifts and Favors."  Those 2 Sections do not allude to any specific gift, and their inclusion can only be a nod to the 31 paragraphs listed above, implying that those events are illegal gifts without making the case.

(17)  Perhaps after 2 ½ years investigating those events on the theory that they were corrupt gifts, the Government has decided that it is strategically unwise to seek a prison sentence on a politician for attending promotional dinners, traveling on County business, or attending events at a VIP table.  The Government's Motion in Limine would seem to concede that point by minimizing such allegations to a nullity.  The sheer volume of allegations invoking such acts, however, speaks to the degree to which the Government will rely on those optics to cast suspicion over Ms. Frost's motives in helping arrange the sponsorships.

(18)  "Motive is always relevant in a criminal case, even if it is not an element of the crime."  U.S. v. Sriyuth, 98 F.3d 739, n. 12 (3rd Cir. 1996).  Accord U.S. v. Hill, 643 F.3d 807, 843 (11th Cir. 2011).  Even if the Government were to abandon evidence of these alleged personal benefits, evidence that tends to show that there was good cause to enter into those advertising sponsorships would be admissible.

(19)  The case as outlined in the Indictment alleging various 'personal benefits,' however, invites evidence to show that there was another reason - a legitimate purpose - for the advertising sponsorships.  Presented for this purpose, the court would have to find that some prejudicial effect substantially outweighed that probative value.  Fed.R.Evid. 403.  Defendant cannot

anticipate what that prejudice might be.

## THE EVIDENCE IS RELEVANT TO DISPROVE THE ELEMENT OF SPECIFIC INTENT

(20) The defendant agrees with the Government that the case technically rests on its allegation that Ms. Frost violated the Federal misapplication statute. Though the statute charged in Counts 1 through 6 (18 U.S.C §666(a)(1)(A)) proscribes embezzlement, theft, fraud, conversion, and misapplication, the Government alleges only "conversion" and "misapplication." Indictment @ ¶¶ 109 & 118. That "misapplication" could only be found from the allegation that defendants circumvented North Carolina state law (N.C.G.S. 158-7.1) which (allegedly) requires a public meeting and Board vote.[1]

(21) Counts 7-11 charge mail fraud in violation of 18 U.S.C. §1341, which rests on the allegation that the payments were made "without lawful authority." Indictment @ ¶ 122. The absence of that lawful authority must flow from the same 158-7.1 violation. Thus, the fraud counts rise or fall on the same proof as the Section 666 misapplication counts.

(22) In both Section 666 and Section 1341, the Government must prove that Ms. Frost knew a vote was legally required and nonetheless specifically intended to circumvent that vote. Section 666(a)(1)(A) uses those very terms in the context of the indicted acts "converts" and "misapplies" ("… or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property …."). Similarly, guilt of a mail fraud requires the specific intent to defraud. U.S. v. Wynn, 684 F.3d 473, 478 (2012).

---

[1] Defendant has qualified the statement that these advertising sponsorships required a vote because on its face, N.C.G.S. 158-7.1 does not appear to apply. The statute lists 9 types of economic incentives to which it applies and none address advertising. Upon information and belief, applicability of the statute to expenditures which are not on that list flows from a NC appellate case, McCready v. Winston-Salem, 342 N.C. 708 (1996). Whether the statute does or does not apply to advertising, it is arguably obscure, and the Government must prove that Ms. Frost knew of and intentionally violated that voting requirement.

(23)  Throughout the investigations and litigation, the defense has maintained that Ms. Frost was not aware that advertising expenditures were subject to the voting requirements of the common Economic Development Incentive projects arising under Section 158-7.1.  She understood those to be projects funded to lure companies to locate in the County, create jobs, and increase the tax base.  Not knowing a vote was required belies specific intent: One cannot intentionally circumvent a statute that one does not know applies.

(24)  Proof of bad motive indicates the likelihood of specific intent to commit a crime. U.S. v. Schnabel, 939 F.2d 197, 202 (4th Cir. 1991)(holding motive evidence admissible to prove specific intent to commit mail fraud).  The converse is also true:  Proof of a legitimate motive tends to undermine the likelihood that a defendant would choose to break the law.

(25)  Known, rational, and ultimately proven reasons to promote Buncombe County and the Airport through the TIEC entities provided a legitimate motive to enter into those advertising promotional contracts.  That motive makes it less likely that Ms. Frost would choose to knowingly break the law.


## PROOF THAT THE COUNTY RECEIVED FAIR VALUE IS A DEFENSE TO THE MISAPPLICATION STATUTE

(26)  The Government argues that evidence of value in the advertising sponsorships is "legally irrelevant" because having a legitimate purpose for an expenditure it is not a defense to Section 666 misappropriation.

(27)  The Government cites a line of cases for that proposition, the most recent of which is a 2006 case using similar language, but as the Government acknowledges, addresses sentencing, not guilt under Section 666(a)(1)(A).  U.S. v. De La Cruz, 469 F.3d 1064 (7th Cir. 2006). It is inapposite.

(28) There is no controlling case from the 4th Circuit.

(29) The defendant would note that the remaining cases cited by the Government (from 4 other circuit courts) are not a compelling string. Every one of them is predicated on an explicit adoption of U.S. v. Urlacher, 979 F.2d 935 (2nd Cir. 1992). The Urlacher court reached the conclusion that under Section 666(a)(1)(A), the definition of the word misapplication "must mean intentional misapplication *for otherwise legitimate purposes.*" Id. @ 938. It reached that conclusion by surveying the universe otherwise covered by the other 4 prongs of 666(a)(1)(A) – embezzling, stealing, obtaining by fraud, and converting – and declaring that they "cover any possible taking … for one's own benefit." Id. Thus, the logic was that the straggler, 'misapplication,' must mean the opposite: taking "for otherwise legitimate purposes." Perhaps that is correct, but the most recent case cited in the brief relying on it was published 17 years ago.

(30) More recently, the Seventh Circuit reversed a defendant's conviction of a 666 'misapplication' because the contract executed by a state contracting officer in violation of a procurement statute was, nonetheless, at market price. U.S. v. Thompson, 484 F.3d 877, 881 (7th Cir. 2007). The court noted first that the caption of 18 U.S.C. §666 is "Theft or bribery concerning programs receiving Federal funds." Having analyzed the possible impact of that heading, the court concluded that a broad reading of "misapplies" would tend to turn "all (or a goodly fraction of) state-law errors or political considerations in state procurement into federal crimes, and a narrow reading limits Section 666 to theft, extortion, bribery *and similar corrupt acts*, a court uses the statute's caption for guidance." Id. (emphasis added). It went on to say that, [a]n error – even a deliberate one, in which the employee winks at the rules in order to help out someone he believes is deserving … is a civil rather than a criminal transgression." Id.

Thompson is not 100% on point, but it is notable that in reaching that conclusion, that Seventh Circuit panel did not cite and was not troubled by the fact that another Seventh Circuit case from 2004 (cited in the Government's Motion) had adopted Urlacher.[2]

(31)  The Eleventh Circuit is the most recent court to weigh in on this question.  In U.S. v. Jimenez, 705 F.3d 1305 (11th Cir. 2013), the court reversed a Section 666(a)(1)(A) "misapplication" conviction.  The defendant was a Deputy Director of Fiscal and Administrative Services at Head Start, a state agency.  He proactively interceded with several agency employees and succeeded in getting Head Start to buy $9000 worth of a children's book which his wife had written.  The evidence was that the purchase was structured to fall below the $10,000 threshold at which the agency had to turn the transaction over to the County procurement office, and outside the agency that the defendant worked for.  The facts established, at a minimum, that the defendant has violated regulations requiring disclosure of a conflict of interest and he was convicted at trial.  There was no allegation that Head Start had over-paid for the purchase, which the defendant had essentially ramrodded through.

(32)  First, the Jimenez court surveyed the case law and "[found] the Seventh Circuit's opinion in Thompson helpful – if not to definitely decide *what* 'intentionally misapplies' means." Id. @ 1309.  The court, however, reversed the conviction on somewhat different grounds.  The court focused on the fact that the defendant himself had not actually directed the funds, rather another Head Start employee had arranged for the purchase that the defendant had negotiated and pitched.  Thus, it did not directly apply Thompson and concluded that, acting in his capacity as a facilitator of the transaction, the defendant had not "applied" the funds at all.

---

[2]  Thompson is also notable for a somewhat unique procedure.  The Seventh Circuit panel that heard the case decided summarily at oral argument to reverse so that it could release the defendant from custody immediately.  The opinion followed 15 days later.

(33)  The evidence which the government argues in its Motion is irrelevant tend to prove that the value of the advertising sponsorships was substantial and borne out by the market.  Ms. Frost's role in disbursing the money was limited, with Ms. Greene being the County Manager, directing the payment processing.  Applying Thompson and Jimenez to the actions of Ms. Frost, the evidence which is the subject of the Motion in Limine is directly relevant.

CONCLUSION

The defense will present evidence tending to show that the advertising promotional contracts with the TIEC entities served a rational and legitimate purpose.  Notwithstanding an Indictment rife with allegations of self-dealing and personal benefits, she was motivated by a desire to capitalize on the opportunity that TIEC presented for Buncombe County.  This evidence will also tend to undermine the Government's claim that she was acting with full knowledge of the statutory voting requirement and intentionally circumvented it.  Finally, the defense contends that the facts as they come out in trial, will establish that the contracts were for a legitimate purpose and did not constitute a criminal misapplication of the County's money.

Respectfully submitted, this the 27th day of February, 2020.

_____
s/ANTHONY G. SCHEER
NC Bar # 19257
Attorney for the Defendant
Rawls, Scheer, Clary, & Mingo, PLLC
1011 East Morehead Street, Suite 300
Charlotte, North Carolina 28204
704-376-3200 (office)
704-332-2716 (fax)
tscheer@rscmlaw.com

# CERTIFICATE OF SERVICE

      The undersigned attorney hereby certifies that he has, this day, served a copy of the attached Motion on the parties listed below by ECF Notification system at the email address listed below.

**AUSA Richard Edwards**
United States Attorney's Office – WDNC
233 U.S. Courthouse Bldg.
100 Otis St.
Asheville, NC 28802
Richard.edwards2@usdoj.gov

**AUSA Don Gast**
United States Attorney's Office – WDNC
233 U.S. Courthouse Bldg.
100 Otis St.
Asheville, NC 28802
Don.Gast@usdoj.gov

This the 27th of February, 2020.

                                                s/ANTHONY G. SCHEER
                                                           NC Bar # 19257
                                                     Attorney for the Defendant
                                       Rawls, Scheer, Clary & Mingo, PLLC
                                   1011 East Morehead Street, Suite 300
                                        Charlotte, North Carolina 28204
                                               704-376-3200 (office)
                                                 704-332-2716 (fax)
                                                tscheer@rscmlaw.com